UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Blue Cross and Blue Shield of Minnesota,     Civil No. 05-910 (DWF/AJB)
a Minnesota corporation, and its parent;
Aware Integrated, Inc., and its subsidiaries;
Comprehensive Care Services, Inc.,
a Minnesota corporation; First Plan of
Minnesota, a Minnesota corporation;
Atrium Health Plan, Inc., a Wisconsin
corporation; HMO Minnesota, a Minnesota     **MEMORANDUM**
corporation; American Medical Security     **OPINION AND ORDER**
Life Insurance Company, a Wisconsin
corporation and a subsidiary of Pacificare
Health Systems, a Delaware company;
Assurant Health, a Wisconsin corporation
and a subsidiary of Assurant, Inc., a New
York company; Blue Cross Blue Shield
of Massachusetts, a Massachusetts
corporation; Blue Cross Blue Shield of Nebraska,
a Nebraska corporation; Carefirst, Inc.,
a Maryland corporation and its subsidiaries;
Carefirst of Maryland, Inc., a Maryland
corporation; Willse & Associates, Inc.,
a Maryland corporation; CFS Health Group,
Inc., a Maryland corporation; Delmarva
Health Plan, Inc., a Maryland corporation;
Free State Health Plan, Inc., a Maryland
corporation; Patuxent Medical Group, Inc.,
a Maryland corporation; Group Hospitalization
and Medical Services, Inc., a company created
under federal charter; Capital Care, Inc.,
a District of Columbia corporation; Capital Area
Services, Inc., a West Virginia corporation;
Blue Cross Blue Shield Delaware, a Delaware
corporation; Excellus Health Plan, Inc.,
and its subsidiary; EBS Benefit Solutions, Inc.,
a New York corporation; Group Health Service
of Oklahoma, Inc., an Oklahoma corporation and
its subsidiary d/b/a Blue Cross Blue Shield of
Oklahoma; GHS Health Maintenance Organization,
Inc., an Oklahoma corporation d/b/a Bluelincs HMO;
Hawaii Medical Service Association, a Hawaii

non-profit mutual benefit society d/b/a Blue Cross Blue Shield of Hawaii; Health Care Service Corporation, an Illinois Mutual Legal Reserve Company, on behalf of itself and its Illinois, New Mexico and Texas Divisions; Horizon Health Care Services, Inc., a New Jersey corporation and its subsidiaries d/b/a Horizon Blue Cross Blue Shield of New Jersey; Horizon Healthcare of New Jersey, Inc., a New Jersey corporation; Horizon Healthcare of New York, Inc., a New York corporation; Horizon Healthcare Insurance Company of New York; a New York corporation; Horizon Healthcare Administrators, a New Jersey corporation; Horizon Healthcare Insurance Company of Pennsylvania, a Pennsylvania corporation; Horizon Healthcare of Pennsylvania, Inc., a Pennsylvania corporation; Horizon Healthcare of Delaware, Inc., a Delaware corporation; Humana Inc., a Delaware corporation and its subsidiaries; Humana Medical Plan, Inc., Humana Health Insurance Company of Florida, Inc., Florida corporations; Humana Employers Health Plan of Georgia, Inc., a Georgia corporation; Humana Insurance of Kentucky, Kentucky corporations; Humana Health Benefit Plan of Louisiana, Inc.; Health One, Inc., Louisiana corporation; Humana Health Plan, Inc.; Humana Health Plan of Ohio, Inc., an Ohio corporation; Humana Health Plans of Puerto Rico, Inc; Humana Insurance of Puerto Rico, Inc., Puerto Rico corporations; Humana Health Plan of Texas, Inc., a Texas corporation; Humana Insurance Company; Humana Wisconsin Health Organization Insurance Corporation; Wisconsin corporations; Louisiana Health Service & Indemnity Company, a Louisiana health insurer and mutual company and its wholly-owned subsidiary, d/b/a Blue Cross Blue Shield of Louisiana; HMO Louisiana, Inc., a Louisiana corporation and health maintenance organization; Medical Mutual of Ohio, an Ohio mutual insurance company and its subsidiaries;

Medical Health Insuring Corporation of Ohio, an
Ohio corporation; Consumers Life Insurance Company,
an Ohio corporation; Medical Mutual Services, LLC,
an Ohio limited liability company; Mutual of Omaha
Insurance Company, a Nebraska mutual company,
and its subsidiaries; United of Omaha Life Insurance
Company, a Nebraska corporation; United World Life
Insurance Company, a Nebraska corporation;
Exclusive Healthcare, Inc., a Nebraska corporation;
Oxford Health Plans, LLC, a Delaware limited liability
corporation; Oxford Health Plans (CT), Inc., a
Connecticut corporation; Investors Guarantee Life
Insurance Company, a California corporation;
Oxford Benefit Management, Inc., a Connecticut
corporation; Oxford Health Plans (PA), Inc.,
a Pennsylvania corporation; Oxford Health Plans
(NH), Inc., a New Hampshire corporation; Oxford
Health Insurance, Inc., a New York corporation;
Oxford Health Plans (NY), Inc., a New York
corporation; Oxford Health Plans (NJ), Inc.,
a New Jersey corporation; The Regence Group,
an Oregon company; Regence Blueshield of Idaho,
an Idaho mutual health insurance company; Regence
Bluecross Blueshield of Oregon; Regence HMO
Oregon, Oregon companies; Regence Blueshield,
a Washington company; Regence Blueshield of Utah,
a Utah company; Wellmark, Inc., an Iowa corporation
d/b/a Wellmark Blue Cross and Blue Shield of Iowa,
d/b/a Wellmark Community Insurance, Inc., d/b/a
Wellmark Health Plan of Iowa, Inc.; Wellmark of
South Dakota, Inc., a South Dakota corporation and
their subsidiaries and affiliates d/b/a Wellmark Blue
Cross and Blue Shield of South Dakota,

                Plaintiffs,

v.

GlaxoSmithKline plc, an English public limited
company and it subsidiaries; SmithKline Beecham
Corp., a Pennsylvania corporation; Beecham Group

3

plc, an English public limited company; and
SmithKline Beecham PLC, an English public
limited company,

                      Defendants.

_____

Annamarie A. Daley, Esq., Brent L. Reichert, Esq., Jeffrey R. Vesel, Esq., and W. Scott Simmer, Esq., Robins Kaplan Miller & Ciresi LLP, counsel for Plaintiffs.

Christine C. Levin, Esq., George G. Gordon, Esq., and Joseph A. Tate, Esq., Dechert LLP – Philadelphia; and Michael A. Lindsay, Esq., and Paul J. Robbennolt, Esq., Dorsey & Whitney LLP, counsel for Defendants.

_____

## Introduction

The above-entitled matter came before the undersigned United States District Judge on December 9, 2005, pursuant to two motions brought by Defendants GlaxoSmithKline plc, SmithKline Beecham Corp., Beecham Group plc, and SmithKline Beecham PLC (collectively, "GSK"):  (1) a Motion to Dismiss Count I of Plaintiffs' Complaint for Failure to State a Claim and to Dismiss Plaintiffs' Complaint in its Entirety for Lack of Subject Matter Jurisdiction; and (2) a Motion to Transfer to the Eastern District of Pennsylvania.  In their Amended Complaint, Plaintiffs assert eighty-one causes of action against Defendants.  Count I alleges unlawful monopolization by Defendants in violation of § 2 of the Sherman Act, 15 U.S.C. § 2.  Plaintiffs also request injunctive relief pursuant to § 16 of the Clayton Act, 15 U.S.C. § 26. The remaining eighty counts relate to alleged violations of various states' laws, including state law claims of antitrust and unfair and deceptive trade practices, insurance fraud, tortious interference with business relationships or prospective economic advantage, unjust enrichment, and common law fraud.  For the reasons stated below, Defendants' Motion to Dismiss is granted;

Defendants' Motion to Transfer is denied as moot.

**Background**

This case involves claims by seventy-eight health benefit plans (including subsidiaries) that provide prescription drug benefits for consumers. Plaintiffs opted out of the settlement of an indirect purchaser class action filed in the Eastern District of Pennsylvania, *Nichols v. SmithKline Beecham Corp.*, C.A. No. 00 CV 6222 (E.D. Pa.) (Padova, J.). The *Nichols* case has settled, as has a case brought on behalf of a class of direct purchasers. *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, C.A. No. 03-4578 (E.D. Pa.) (Padova, J.). Another case brought by the City of New York recently settled before Judge Padova. *City of New York v. GlaxoSmithKline plc*, C.A. No. 04 CV 2134 (E.D. Pa.).

The subject matter of all of these cases is substantially similar. In each of the actions, the plaintiffs allege that GSK violated § 2 of the Sherman Act by (1) obtaining patents through fraud on the United States Patent and Trademark Office ("PTO"); (2) improperly listing those patents in the Food and Drug Administration's ("FDA") Orange Book; and (3) enforcing the patents by engaging in sham infringement cases against would-be generic drug producers. Plaintiffs assert that GSK committed these acts in order to delay the entry of lower-priced generic drug alternatives into the market and thus to monopolize the market on paroxetine hydrochloride, the generic name for GSK's prescription antidepressant Paxil®. The Amended Complaint alleges that GSK's actions violate § 2 of the Sherman Act, 15 U.S.C. § 2, and Plaintiffs seek damages pursuant to § 4 of the Clayton Act, 15 U.S.C. § 15, and injunctive relief pursuant to § 16 of the Clayton Act. In addition, Plaintiffs seek recovery under various states' antitrust, consumer protection, and insurance statutes, and for common law fraud and

unjust enrichment.

GSK has brought two separate motions in the case before this Court. First, GSK has moved to dismiss Count I of the Amended Complaint for failure to state a claim and to dismiss the Amended Complaint in its entirety for lack of subject matter jurisdiction. Second, in the event that the Court denies the motion to dismiss or finds that subject matter jurisdiction exists over Plaintiffs' remaining claims, GSK has moved to transfer the action to the Eastern District of Pennsylvania. The Court will address each of these motions in turn.

## Discussion

### I. Motions to Dismiss the Federal Claims

In deciding a motion to dismiss, the Court must assume all facts in the complaint to be true and construe all reasonable inferences from those facts in the light most favorable to the complainant. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986). The Court grants a motion to dismiss only if it is clear beyond any doubt that no relief could be granted under any set of facts consistent with the allegations in the complaint. *Id.* The complaint "must contain sufficient facts, as opposed to mere conclusions, to satisfy the legal requirements of the claim to avoid dismissal." *DuBois v. Ford Motor Credit Co.*, 276 F.3d 1019, 1022 (8th Cir. 2002).

#### A. Damages

The Supreme Court has held that only the "direct purchaser" from a monopoly supplier may recover damages under § 4 of the Clayton Act. *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977); *see also Campos v. Ticketmaster Corp.*, 140 F.3d 1166, 1169 (8th Cir. 1998). "The Supreme Court has defined an indirect purchaser as one who is not the 'immediate buyer from the alleged

antitrust violator'" or "one who '[does] not purchase [the monopolized product] directly from the [antitrust] defendant[.]'" *Campos*, 140 F.3d at 1169 (quoting *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 207 (1990); and quoting *California v. ARC America Corp.*, 490 U.S. 93, 97 (1989)). The Eighth Circuit has further defined an indirect purchaser as "one who bears some portion of a monopoly overcharge only by virtue of an antecedent transaction between the monopolist and another, independent purchaser." (*Id*.) The Eighth Circuit has stated that indirect purchasers "may not sue to recover damages for the portion of the overcharge that they bear." (*Id*. at 1170.) Rather, "[t]he right to sue for damages rests with the direct purchasers, who participate in the antecedent transaction with the monopolist." (*Id*.) As noted by the Eighth Circuit in *Campos*,

> If both direct and indirect purchasers were allowed to sue for damages, the courts would be faced with the "famously difficult" task of apportioning the payment of overcharges between direct and indirect purchasers. The alternative is to allow duplicative recovery, which the Supreme Court also disapproves of and the avoidance of which constitutes another rationale for the direct purchaser rule. . . . The Supreme Court has declined to involve the federal courts in such an analysis, except in very limited circumstances, explaining that "[t]he direct purchaser rule serves, in part, to eliminate the complications of apportioning overcharges between direct and indirect purchasers."

*Campos*, 140 F.3d at 1170 (internal citations omitted).

GSK contends that, as indirect purchasers, Plaintiffs may not recover damages under the Sherman Act pursuant to the Supreme Court's holding in *Illinois Brick*. Although Plaintiffs never contend that they are *direct purchasers* of Paxil®, Plaintiffs assert that they have properly alleged *direct injury* to their managed care programs as a result of GSK's monopolistic conduct. Specifically, Plaintiffs contend that GSK's "illegal actions intended to render Plaintiffs' managed care programs useless to reduce prescription drug prices" and that GSK "intended through this conduct to prevent use

7

of Plaintiffs' managed care programs under which generics would have been purchased." (Amended Complaint at ¶ 30.) Plaintiffs allege that GSK "unlawfully kept generics from entering the relevant market and kept Plaintiffs from being able to utilize managed care programs with regard to Paxil® and generic bioequivalents of Paxil®." (*Id*.) Thus, Plaintiffs assert that "[i]n the absence of available generic bioequivalents of Paxil®, Plaintiffs were forced to absorb and incur directly the supracompetitive costs of Paxil®." (*Id*.) The Amended Complaint states that the managed care programs that Plaintiffs employ "keep costs down by encouraging and/or mandating the prescribing and dispensing of generic alternatives." (*Id.* at 33.) Plaintiffs maintain that their managed care programs depend on competition between pharmaceutical manufacturers and the availability of generic alternatives to brand-name drugs. (*Id*.)

In addition, the Amended Complaint asserts that "[b]y improperly preventing competitors from obtaining FDA approval to enter the relevant market with less expensive generic bioequivalents of Paxil®, [GSK] effectively thwarted Plaintiffs' and other health benefit plans' efforts to utilize generic bioequivalent substitutes of Paxil®." (*Id*. at ¶ 34.) As a result of this conduct, Plaintiffs assert that they "could not use and/or could not as effectively use their managed care programs to control the high cost of Paxil® during the relevant time period." (*Id.* at ¶ 35.) In addition, Plaintiffs assert that they were "unable to employ managed care programs and unable to take advantage of existing laws and contracts that encourage and/or mandate the use of generic drugs that are AA or AB-rated to Paxil®." (*Id*. at ¶ 36.) Plaintiffs further complain that as a result of GSK's conduct, "Plaintiffs were prevented from implementing generic substitution programs within their prescription drug managed care programs and, consequently, paid at supracompetitive prices for some or all of the cost of Paxil®, and have thereby

been injured." (*Id.* at ¶ 70.) Finally, the Complaint alleges that Plaintiffs were "directly injured and prevented from implementing generic substitution programs for Paxil®. This injury resulted in the payment by Plaintiffs of higher prices for Paxil® and its generic bioequivalents of Paxil® than Plaintiffs would have paid in the absence of [GSK's] unlawful conduct." (*Id*. at ¶ 76.) Based on these assertions of the Amended Complaint, Plaintiffs maintain that their Sherman Act claim is not a claim for pass-through damages as indirect purchasers and thus that Plaintiffs have standing to bring their Sherman Act claims.

Here, GSK sold Paxil® to wholesalers, who then sold Paxil® to pharmacists, who in turn re-sold Paxil® to consumers who may have been covered by Plaintiffs' managed care programs. Although Plaintiffs attempt to characterize their injury as direct damage to their managed care programs, Plaintiffs' injuries are essentially that they lost profits after paying more for Paxil® than they would have paid in the absence of the alleged monopolistic conduct. Indeed, at oral argument on this matter, Plaintiffs confirmed that the consequence of their inability to employ their managed care programs, in terms of money damages, resulted in "lost profits." (R. Tr. at 80.) Plaintiffs' counsel stated, "if we had had the generics available, we would have paid higher dispensing fees to the pharmacies, because we . . . encouraged or mandated them to use the generics where we can mandate them." (*Id.* at 81.) Plaintiffs have failed to provide the Court with any quantitative measure of their damages other than the overcharges that they paid as a result of the alleged monopolistic conduct.

Plaintiffs' reliance on *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982), is misplaced. In *McCready*, the Supreme Court addressed whether a health plan subscriber who employed the services of a psychologist had standing to maintain an action under § 4 of the Clayton Act

9

when the plan failed to provide reimbursement for the costs of the subscriber's treatment. 457 U.S. at 467. The plan at issue in *McCready* provided reimbursement for costs of outpatient therapy provided by psychiatrists, but not for the services of psychologists. *Id.* at 468. McCready submitted claims for costs of her treatment from a clinical psychologist, and her claims were denied. The Supreme Court found that unlike the situation at issue in *Illinois Brick*, permitting McCready to proceed with her Clayton Act claim offered "not the slightest possibility of a duplicate exaction" of damages from Blue Shield. *Id*. at 475. The Court noted that McCready had paid her own psychologist bills, and no other person along the chain of distribution would have been able to claim out-of-pocket damages for violations of the antitrust laws as a result of the plan's failure to pay benefits. *Id.* Applying a "proximate cause" theory to McCready's claims, the Court found that McCready did indeed have standing to recover damages under § 4. *Id*. at 477–85.

Unlike the plaintiff in *McCready*, Plaintiffs do not complain of an injury that is unique to them. Rather, Plaintiffs are seeking recovery for the same overcharges that were suffered by the direct purchasers. The Court recognizes that some of these overcharges eventually could have been passed to the Plaintiffs by the direct purchasers, but the Court is not permitted to engage in the complicated analysis as to how those overcharges were apportioned among the chain of distribution. *Illinois Brick*, 431 U.S. at 737; *Campos*, 140 F.3d at 1170. Plaintiffs are plainly alleging an injury that is derivative of the injury suffered by the direct purchasers. As a result, *McCready* does not apply and Plaintiffs do not have standing to bring their claims for direct damages under § 4 of the Clayton Act.

**B.     Injunctive Relief**

Plaintiffs have also asserted a demand for injunctive relief pursuant to § 16 of the Clayton Act. The Amended Complaint seeks "[j]udgment against [GSK] granting injunctive relief and enjoining [GSK] from continuing the activities complained of herein." (Complaint at 131.) GSK asserts that Plaintiffs claim for injunctive relief fails on mootness and vagueness grounds and thus that the portion of Count I of the Amended Complaint by which Plaintiffs request injunctive relief should be dismissed. The Court agrees.

Undisputedly, a generic version of Paxil® has been on the market for over two years, and several generic companies are selling a generic equivalent. It would be meaningless for Plaintiffs to seek injunctive relief that would prohibit GSK from continuing to prevent generic competition to enter the market, when such generic competition already exists. Thus, to the extent that Plaintiffs attempt to enjoin behavior that has already been remedied, the Court finds that Plaintiffs' request for injunctive relief is moot.

Moreover, Plaintiffs' remaining allusions to injunctive relief are too vague to provide the basis for any remedy. The Amended Complaint does not provide the Court with any indication of the injunctive relief that Plaintiffs seek, and Plaintiffs' briefing on the issue has been equally ambiguous and conclusory. For instance, Plaintiffs assert that GSK has "not voluntarily stopped the allegedly illegal conduct: Conduct complained of in the Amended Complaint is being repeated." (Plaintiffs' Corrected Opposition to Defendants' Renewed Motion to Dismiss Count I of Plaintiffs' Amended Complaint for Failure to State a Claim and to Dismiss Plaintiffs' Complaint in its Entirety for Lack of Subject Matter

Jurisdiction ("Pl's Opp. Mem.") at 20.) But Plaintiffs are unable to point to any specific conduct that they believe is being repeated that they seek to enjoin.

Plaintiffs' briefing further adds that GSK "for example, may yet list additional Paxil® patents with the FDA." (*Id*.) It would be more than difficult for the Court to fashion some type of injunctive relief based upon this vague conjecture. The suggestion that Plaintiffs may someday improperly list some yet unidentified patents in the Orange Book is far too speculative to provide the basis for injunctive relief. Plaintiffs have not provided the Court with any concrete measure of the relief that they request, and thus Plaintiffs' claim for injunctive relief fails on vagueness grounds.

## II.     Remaining State Law Claims

In the absence of a Federal claim, the Court must address whether the Court has subject matter jurisdiction over Plaintiffs' remaining state law claims. Dismissal for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) will not be granted lightly. *Wheeler v. St. Louis Southwestern Ry. Co.*, 90 F.3d 327, 329 (8th Cir. 1996), *citing Bowe v. Northwest Airlines, Inc.*, 974 F.2d 101, 103 (8th Cir. 1992). Dismissal is proper, however, where an attack on the complaint's alleged basis for subject matter jurisdiction reveals that there is no actual basis for jurisdiction. *Wheeler*, 90 F.3d at 329, *citing Bowe*, 974 F.2d at 103.

A motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) may challenge the plaintiff's complaint either on its face or on the factual truthfulness of its averments. *Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir. 1993); *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990). In a facial challenge to jurisdiction, the court restricts its review to the pleadings and affords the non-moving party the same protections that it would receive under a Rule 12(b)(6) motion to

dismiss. *Osborn*, 918 F.2d at 729 n.6. In a factual challenge to jurisdiction, the court may consider matters outside the pleadings and the non-moving party does not benefit from the safeguards of 12(b)(6). *Titus*, 4 F.3d at 593; *Osborn*, 918 F.2d at 729 n.6. "In short, no presumptive truthfulness attaches to the plaintiffs' allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Moreover, the plaintiff will have the burden of proof that jurisdiction does in fact exist." *Osborn*, 918 F.2d at 730. Here, GSK makes a factual challenge to this Court's jurisdiction. GSK asserts that in the absence of Plaintiffs' standing to assert a damage claim under the Clayton Act, the Court has no jurisdiction over the remaining state law claims in the Amended Complaint. Thus, GSK asserts that the Amended Complaint should be dismissed in its entirety. Plaintiffs, on the other hand, contend that the Court has original jurisdiction over the remaining state law claims because resolution of a substantial federal question is necessary to adjudicate these claims. Specifically, Plaintiffs contend that substantial questions of federal patent law (i.e., fraud on the PTO and sham patent litigation) are necessary to resolve all of the state law claims.

Federal district courts have "original jurisdiction of any civil action arising under any Act of Congress relating to patents . . . . Such jurisdiction shall be exclusive of the courts of the states in patent . . . cases." 28 U.S.C. § 1338(a). Federal jurisdiction under 28 U.S.C. § 1338(a) is present only when "a well-pleaded complaint establishes either that the federal patent law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law, in that patent law is a necessary element of one of the well-pleaded claims." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 808–09 (1988) (citations omitted). The Supreme Court has held that it is not sufficient that a claim alleges one theory, among others, under which

resolution of a patent-law question is essential. *Id*. at 810. "[A] claim supported by alternative theories in the complaint may not form the basis for § 1338(a) jurisdiction unless patent law is essential to *each* of those theories." *Id*. (emphasis supplied).

It is undisputed that the remaining eighty claims in Plaintiffs' Amended Complaint assert only state law causes of action. Plaintiffs summarily argue that this Court has original jurisdiction over these claims because substantial questions of patent law must be resolved in order to decide the claims. However, Plaintiffs do not point to a single claim that requires resolution of a patent law question. In fact, Plaintiffs briefing in regard to the preemption issue states the contrary. Plaintiffs' opposition brief states, "Plaintiffs here do not rely solely on Walker Process fraud and sham litigation claims to support their state law counts. . . . [t]he allegations of fraud on the Patent office and sham litigation are not the sole bases for Plaintiffs' state law claims. The anticompetitive scheme pled in the Amended Complaint encompasses misconduct by Defendants GSK outside the purview of federal patent law." (Pl's Opp. Mem. at 33.) But Plaintiffs cannot have it both ways. Because it is not clear to the Court that Plaintiffs' eighty state law claims will necessarily require resolution of a substantial patent law question, and because Plaintiffs have conceded that they can recover under other theories that do not require the resolution of questions of federal patent law, Plaintiffs have not met their burden of demonstrating that jurisdiction exists. As a result, Counts II-LXXXI of the Amended Complaint are dismissed for lack of jurisdiction.

Because the Court has disposed of the jurisdictional issue on other grounds, the Court need not address GSK's assertion that Plaintiffs' state law claims are preempted because they are based on

federal patent law. In addition, because the Court has granted GSK's motion to dismiss, GSK's motion to transfer is moot.

## Conclusion

Accordingly, **IT IS HEREBY ORDERED THAT:**

1. Defendants' Motion to Dismiss (Doc. No. 7) is **GRANTED.**

2. Count I of the Amended Complaint is **DISMISSED WITH PREJUDICE.**

3. Counts II through LXXXI of the Amended Complaint are **DISMISSED WITHOUT PREJUDICE.**

4. Plaintiffs' Motion to Transfer (Doc. No. 18) is **DENIED AS MOOT.**

5. Plaintiffs' Motion for Leave to File Plaintiffs' Supplemental Memorandum of Law in Opposition to Defendants' Motion to Transfer Proceedings to the Eastern District of Pennsylvania (Doc. No. 43) is **GRANTED**; Plaintiffs' request for leave to submit supplemental memorandum (Doc. No. 45) is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: January 30, 2006              s/Donovan W. Frank
                                     DONOVAN W. FRANK
                                     Judge of United States District Court